James Pfeiffer Federal Defenders on behalf of the appellant, Mr. Camou. This case involves a search of photographs on a cell phone that was removed from the truck, secured in the Border Patrol Station, and then examined 80 minutes later following two rounds of interrogation of witnesses. Under cases like Turner and Maddox, the search was not incident to arrest in terms of time, place, or intervening events. As neither inevitable discovery nor good faith applies to the circumstances here to excuse this unlawful search, the court should order the evidence suppressed. This is a paradigm case of search incident to arrest that doesn't match any of the usual criteria in proximity of time, space, or sequence of events. Given the nature of what was going on that triggered the ultimately the search of the cell phone, you had a smuggler of a, not of drugs, but of a human being. The agents take the cell phone into their custody. In the course of events, the phone rings several times. It turns out, in fact, they have information that it's someone who is connected to the smuggling. Given the nature of smuggling and the well-known, I think I would assume it's well-known, that smugglers frequently are in cahoots with somebody else, why wasn't it reasonable for the agents to examine the phone as, in essence, an instrument of carrying out the smuggling activity to determine whether there was any current information that would be immediately relevant to the crime for which they had actually taken Camus into custody? Yes, Your Honor. During the processing, there's a series of events after the passengers, the people in the car were moved to the Border Patrol Station. It's a series of events which include the phone ringing during this processing time. They found out by interviewing the passenger, Ms. Lundy, that the phone was used to contact a smuggler. Mother Teresa. Mother Teresa, right, and that they recognized her number on the phone when it rang. At that point, the government did, the agents did have probable cause to suspect that this phone was connected to the smuggling because here was the smuggler's phone number, the person they were connecting. Under United States v. Place, when the probable cause arises in the midst of the investigation like this, the procedure is to seize the item and get a search warrant. Well, get a search warrant in a fluid situation, and the situation here is that the caller may well have some reason to believe that something's gone awry, and I don't know that the government has made the argument, but just trying to assess the situation. You have a live instrument with the party to the crime on the other end, and I know there's focus on what might be done with the phone, and we can talk about that, but you now have somebody on the other end, the calling party, Mother Teresa, whoever that may be, who is in a position to destroy evidence, wouldn't you think? I mean, somebody who's receiving this smuggly, for example, could well be put on the alert that they better watch out and so on and so forth. So it's such a fluid situation. That's why I'm having a little trouble. I agree with your statement about it's not quite fitting into any of these blocks, but with the advent of cell phones and the like, we have all this new technology, so that's what is troubling me about this case. Yes, Your Honor. Well, Judge Fischer, precisely because it might have been a different case if they saw Mother Teresa's number and they answered the telephone, and if this was a case about whether they had the right to answer the telephone, but that's not what happened. The phone rang. It rang repeatedly, and then 80 minutes after the arrest, after it had rung several times and they knew who was calling, then they began searching the phone indiscriminately, not going to the communications areas of the phone in particular, but going to all areas of the phone. Are you saying the agents knew who was calling early on? Apparently, they recognized the number from Miss Lundy's. They recognized the number. Yes, they recognized the number as being Mother Teresa, the person involved in the smuggling. They didn't answer the telephone in order to talk to her. They didn't restrict their search to the communications areas of the phone, which was their only concern or the only exigency the government has ever brought forward is that the loss of call logs. Did Camus have any access to the phone after they had taken it out of the truck? None whatsoever, Your Honor. It was secured. It was in the possession of Border Patrol the whole time. So he had no way to delete the incoming calls or any other evidence on the phone? No, Your Honor, and there's no evidence whatsoever that this phone had a remote wipe. So he's arrested. What happens during this 80-minute time period before they start going through the phone log and or the photos and or the videos? A lot happens. What are they doing? Well, there's a lot happening. First, they handcuff Miss Lundy and Mr. Camus, bring them into the Border Patrol station. They're processed. During the processing, the phone is starting to ring. They do an interrogation, asking them about the phone. Are they all together or are they separated? It's not clear because there was never an evidentiary hearing in this case. This is all based on the reports of investigations. So the reports are not. Did the police officer ever say he was fearful that the cell phone memory might be wiped out by somebody else? No, Your Honor. Did the reporter ever say that? No. The only thing, the phrase search incident to arrest appears once or twice in the reports. The officers just threw that phrase into the reports as some kind of talisman. But they never provided any evidence or reasoning why they thought there was an exigency or why they thought that this was indeed a search incident to arrest 80 minutes after the phone had been seized. And how far separated from where the vehicle was and where the interrogation and the review of the phone was? There's no precise information, but I don't think the distance, the physical distance was that great because they were moved from secondary into a border patrol station at the checkpoint. But my point was that, functionally, the distance was great because they were moved from a more public area to an area of a fish officer-dominated area. They were moved into a border patrol station. They were put into holding cells. They were in interview rooms. They were in a completely police-dominated. And even though the distance, the physical distance, isn't that great, as in Caceres, for instance, where it was like a block and a half away, here the functional distance was much greater. We went from a more public area like the street in Caceres, a public street, to a confined officer-dominated area. Functionally, that's a great distance. They didn't answer the phone, but I assumed that in my question at the beginning. An unanswered phone to the calling party may well be a signal of just what had happened, that the person being called had been taken into custody. So why isn't there a concern about or a justification under exigent circumstances, destruction of evidence, for what the calling party might be able to do? Your Honor, there was absolutely no evidence to show that this phone had the capacity of remote wiping. I'm not even suggesting remote wiping. What about destroying the evidence that the calling party might have in his or her possession or might be able to alert other people who are involved in the crime? Two answers to that. You're saying, hey, listen, I'm calling Camus and he's not picking up. There must be something wrong. Flee. Destroy. Whatever. I think two central answers to why that doesn't matter here. Number one, there was no reason to believe at all that the number of incoming calls, however many incoming calls there were, would anyway affect the storage of photographs in the memory. There's no indication that if you get 100,000 calls, that the photographs would ever be deleted because of the number of calls coming in. Only the call logs would be affected. So you're saying that it would have been okay if they confined the search to the call logs or text messages or e-mails? I think the government would have a much better case of that. But something's wrong with photos. Photos had absolutely nothing to do with it. Photos, in fact, may prove not to have anything to do. But you're saying it's illogical to look at photos? I'm not sure I understand your argument. Can I get an answer to what I just asked? I believe that there is no probable cause. There was no probable cause to search the photograph area of the phone. There's no reason to believe that there are any photographs associated with alien smuggling on the telephone. Well, what do people use their cell phones for? They use them as cameras. They take pictures of whatever they're doing. But that wasn't the exigency. That wasn't the way that the government and the district court ever justified this. They said the worry was that the call logs were going to be deleted. But they didn't go directly to the photos, did they? It's hard to tell, Your Honor. They just said they started looking at the phone, and because it's the photographs that are pertinent here, they just said they started mining the phone, and they found these photographs. Mining. What do you mean by mining? We just had this Cotterman case, and I'm particularly interested in it because you've talked about it. It's been brief. But having been on that, in Cotterman we were talking about an exhaustive forensic search, not just a flipping through the phone to see what's on it or through the laptop. So I want to make sure when you say something like mining, we get straight what has actually been done here. Your Honor, that they were not confining the search, as far as we can tell, to the areas that were related to the possibility of losing call data. So that's the question. Yes. Whether it's within the proper scope of the search. I believe that's probably the crux of it, is that the photographs simply weren't in the scope of any reasonable excuse, any reasonable violation of the warrant requirement, because there was no reason to believe that photographs related to alien smuggling, as opposed to anything else, were on that telephone. What are the two purposes for a search incident to an arrest? The basic underlying rationales, as pointed out in Schimmel, were protection of the police. Was that involved at all in looking at the cell phone? No, unless there was some reason to believe there was a bomb hidden in the cell phone. There was no reason. So if it's not protection of the police, what's the other justification? Loss of evidence. Okay, they had control of the phone, right? Yes. I mean, did he have any ability or any kind of way he could have? Was there any record evidence that this phone could have been wiped from a distance? No, there was no evidence whatsoever. I mean, could they have just turned the phone off to ensure that it didn't get wiped? Like in the DiMarco case that I cited in the court in 28J, yes, that's exactly. As the district judge there said, that's the way to deal with this. If you're worried about losing data, which in any case, you turn the phone off. But in any case, the evidence here showed that there would be no loss of data because the carrier had records going back a year for all of the calls. They could always get that information. There's really no way to wipe those records out, is there? There is in certain very advanced phones, I understand. Judge Posner in the Flores-Lopez case that was cited by both parties discusses that possibility. There is technology that allows certain advanced phones to be wiped clean from some distance. But as far as the call logs, the things that the Border Patrol was interested in for the alien smuggling, that information was preserved because the carrier keeps written records going back a year of all calls, even missed calls. Is that a generally known fact? I believe so, Your Honor. All carriers do that? Your Honor, I think anyone who's had a phone in the last 30 years knows their monthly bill has all the calls listed there on the bill. That doesn't necessarily mean that they retain the records. What if you have the Metro phone that sells just a blanket plan? Do they keep their records? There's no evidence on that one way or the other, Your Honor. This is all interesting because we're in this new technology land, but we also have to deal with what the agents had on the ground, what they knew. So you're saying, well, they didn't have to worry about a loss of the records anyway because the cell phone provider keeps them. So, A, did they know who the provider was? And, B, did they know what that provider's policies were? There's nothing in the record indicating that. After the fact, yes, it's established. But at the time of the search, that's... Let me ask you this. Did they ask your clients whether they could check the phone? They did, I believe, later on. They asked for consent. We're talking about some exigent circumstances here. Yes. I mean, did they ask? Well, somebody just called. Who was that? They asked who the phone belonged to. They never asked permission until later, after the search. They asked for consent. So when was it that they got interested in the phone? About 80 minutes after the time? The search was 80 minutes after... So if they wanted to search the phone, and really all they had to do was call a magistrate. You'd get a telephonic warrant. Do you know about telephonic warrants? I do, Your Honor, and I think 80 minutes would have been plenty of time to do that. You don't need that much. You just get a magistrate. You talk to the magistrate. You make your statement under oath. The warrant is issued and emailed to you. I'm certain they could have done that in the time that was allowed here. Use his phone number. Email to that phone. Save the problem of having an affidavit. I'm calling from that very phone, Your Honor, they could say, and so here it is. But I just want to end with one last point. You don't think that's a very good idea? I think they definitely should have. I know that's rarely used, telephonic search warrants, but it's right there in the federal rules, and the states have the same thing, but it's rarely used. I'm sure they could have. The important thing is to get a warrant, have an independent magistrate check things out so there's no abuse of power, and we know that cell phones carry a lot, a lot of personal information. Correct, Your Honor, and I think that's the last point I want to end with, is that whatever exigency, whatever concern, a legitimate concern, or interest the Border Patrol had in the call logs about who was calling and how this phone was being used as a communications device to facilitate smuggling, there was no basis to look at the photographs, and that's the key here. Thank you. Good morning. My name is Alessandra Serrano. May it please the Court. Border Patrol agents here acted reasonably in searching the cell phone incident to arrest after the phone was found in a vehicle, after an illegal undocumented alien was found in the back seat. Under United States v. Gantt, a Supreme Court case, Ross and Johns, once probable cause was established to search the vehicle, any container within that vehicle could have been searched, including the phone. Are you giving up then on the search incident to an arrest? No, sir. Are you relying upon the container exception? I'm arguing both, Your Honor. I'm saying that I think the stronger argument is the United States v. Gantt, that once you can search a vehicle pursuant to anything for the crime of arrest, you could search anything in it, alternatively search incident to arrest. I mean, isn't, just by its very nature, a cell phone significantly different than the containers that were part of the automobile exception? That is true. However, the Supreme Court has made a distinction or has failed to make a distinction between worthy and unworthy containers, and that's the acivator. It's by their nature. I mean, cell phones contain so much information. I don't disagree with you. They do. However. How far would you take that? Would you allow someone to access additional off-site information using a cell phone found in a car 80 minutes after an arrest? I think that would violate Rule 41 in ECPA, to use a cell phone to remotely access something in the cloud or some other storage, not either within the district or without. Well, even phones themselves, they don't carry typically all the e-mail messages that are in the phone. Correct, a server. They typically have an ability to continue to access additional messages. Would you allow them to continue to download thousands of messages? I think without, if you're asking me personally, no, I don't think that would be appropriate. But, again, we're not talking about e-mails here. We're not talking about text messages. We're talking about phone logs and photographs on the phone. Did you prosecute this case? I did, sir. Okay. I mean, in terms of the availability information otherwise, I assume you've prosecuted cases where the provider not only has the phone log but has the actual cell towers that trace where a particular individual was at a particular time. I have done that. This case occurred in August of 2009, so obviously we're talking about four years ago, so the amount of data and technology has changed over the course of time. But to address one of the points that you made, sir, Metro PCS or mobile boost phones, those throwaway phones as we routinely call them, they don't carry or they don't retain certain types of data. So each provider, whether it's AT&T, Sprint, Verizon, they have different retention policies. And the same thing would go for cell phone, cell site data. Well, in this case, if they would have simply turned the phone off, gotten a search warrant, what threat would there have been that information that was otherwise on the phone would be deleted? Turning off the phone is not necessarily the best course of action. I think in Flores Lopez, the Seventh Circuit case, did talk about how agents shouldn't be imputed with the knowledge to use what they call a Faraday bag, which is the bag which basically prevents any wireless transmissions to go on. Moreover, if you shut off the phone, that doesn't mean that somebody else like Mother Teresa couldn't have gone in and wiped out logs or however. How typical on this cheap of a phone is that someone would have the ability to come in and wipe a memory clean? I don't know how cheap this phone was, Your Honor. From what I understand, it was a phone that was used at the time and there was no information to believe that the agents... Well, but you had the phone. We did. Yeah. So you don't know what kind of phone it was? Well, I know what kind of phone it was, sir. I just don't know what kind of technology existed at the time, whether it could remotely wipe what was on the phone or the capability of the phone. Well, in terms of wiping it, he hadn't called anybody, right? He had not. The defendant had not used the phone. The only contact with Mother Teresa was her calling the cell phone and not getting an answer. Correct. So under those circumstances, do you think there's a big threat that Mother Teresa would go out and wipe his cell phone when she just simply hasn't gotten an answer? There could be. I mean, the passenger did talk to agents at the time during the booking process. And just to clarify, one thing counsel said is that this phone was searched after the initial booking process before they were interviewed. So it wasn't two rounds of interviews. It was just the initial booking process. In that booking process, they learned from the passenger that she and the defendant had smuggled aliens about eight times per month for this organization. So this wasn't their first rodeo. This is something that they used... I guess the point is, on the exigency, how big of a threat is it that Mother Teresa doesn't get someone to answer a phone, that she's going to go in and go through all the hassle of, even if she had the ability, of wiping the memory on one of her collaborator's phones? I would think it would be pretty great, given that this is an alien smuggling organization, that they were in the business of crossing illegal aliens for profit, and at least this driver and passenger did it eight times per month. And in this case, what was the evidence in terms of whether they were even going to prosecute this guy? At the end of the day, the case was declined. So how big of a threat is it that she's going to go in and wipe out his whole memory for smuggling one guy on the floor of a car? At what point in time? When the alien is initially found, when they come into the checkpoint right after 10 p.m., and the alien is found in the vehicle at 10.40 p.m., the agents don't know the extent of the organization. And also, they don't go through the phone at that time, either. No, they don't. Number one, because of staffing issues, the booking process for both the defendant and the passenger were delayed. The phone was ringing. I mean, the time of events is that the folks are arrested in the vehicle. They are processed. Agents speak with the material witness. There is a delay in booking them. So we got staffing issues now? That was cited in the brief, Your Honor, and it's in the record that there was a delay in the booking process for both. I'm not sure how that helps you. A search incident to arrest is to protect the officers or to prevent destruction of evidence. Correct. Whether it's because you've got low staffing or otherwise, how does that help you on the search incident to an arrest? Well, this Court has held that staffing issues can affect whether search incident to arrest is appropriate or not. I believe it was the knowledge. The logic of that. So if you've waited 80 minutes, you're not concerned about the officer's safety. They've been handcuffed. And 80 minutes with the phone out of the guy's possession, except for this idea of somebody wiping it. I'm not suggesting that these officers were in any kind of danger. What I'm suggesting and I think what I'm trying to answer is you're asking me why 80 minutes has passed, and I'm trying to explain why it wasn't done. I said the 80 minutes. You don't have a search incident to an arrest after 80 minutes, do you? I respectfully disagree. As Judge Pregerson has said, in the Weaver case as well as in the Casares case, that time alone is not dispositive. You have to look at the continuing flow of events as to what happened. Does that help you in this case where they've gone through at least two interviews with these people, separated them, put them in cells, arguably didn't have enough time to address them directly at the time? The evidence is that they were pulled out of the vehicle. The material witness was spoken to to find out where he came from, that the two individuals, the driver and the passenger, were processed and booked. And then the phone was ringing during this time, and then the phone was looked at. Thereafter, both the defendant and the passenger were interviewed, read their Miranda rights, and went on from there. What's the logic? Counsel has emphasized that the key here is looking at the photos. What's the logic of looking at photos? Both the material witness and the passenger mentioned that prior to the material witness, the undocumented alien was picked up at a hotel in Calexico. And so the agents, knowing that sometimes people take pictures of where they are, they started scrolling through not only the phone logs, which is what counsel said that was okay, but also the photographs to see if this phone or this person was involved with the picking up of the alien. In fact, in the record, it does show that there were pictures of the Calexico, California area, which would corroborate the material witness's story as well as the passenger's story that the defendant was involved with. So you're scrolling, I think the record was 170 pictures? The agent did mention that as he is scrolling through the phone, he saw about 170. What's the – am I correct that most typically the pictures are most recent first, then going further back in terms of where the picture is located? That is one way some phones are held. Isn't that the way most are? I can't speak for most phones. I wouldn't disagree. What's the record evidence in terms of how many pictures he had to go through before he got to the child pornography? There was no record evidence as far as how long or how many photos he scrolled to until he hit the child pornography, but he looked in total about 170. I mean, you ultimately had the memory. He must have used it for the prosecution. It may not be record evidence, but how many pictures did he have to go through before he got to the child pornography? There were about 40 or 50, if memory serves. So isn't that just kind of a general search? No, Your Honor. Well, were the first 39 all of the location where he picked the guy up? There were other photos, sexually explicit photos of the passenger that the defendant had taken. That is also in the record. There were other photos that weren't relevant to either the alien smuggling or the child pornography. But to equate the phone, if you look at it in a physical world, like if we had probable cause to search a photo album or a book in the car or a mail, some mail that was in the car. Why couldn't you have gotten a warrant? See, that's what bothers me. You get on the phone. You get a magistrate. You get a warrant. It's not that hard. Probably do it in five minutes. What are you laughing at? I'm laughing because I agree with you that a warrant may have been obtained. However, I've been a prosecutor in my district for 10 years. I have never had been able to get a telephonic warrant. And even the district court noted how likely would it have been to get a warrant at 1040. That's because nobody tries. That's because they look for all these other excuses to avoid getting a warrant. And that's in our Constitution. I respect that. We ought to respect that. And we don't. And it's not hard to get one. Your Honor, I do. Have you ever tried to get one? I have, actually. Yeah. It's very difficult to get a magistrate on the phone after business hours to get a court report. Well, after business hours, you don't have a magistrate that's on duty. We do. Down at the courthouse. 24 hours? They do not sit at the courthouse 24 hours. Well, then San Diego better get one. What would the difference have been if they got the warrant the following day? Turned the phone off and got the warrant the next day? It would have had to have been Monday because the next day would have been Sunday. But, yes, we – and that's precisely – What would the difference have been? If you would have had probable cause to go through the phone, what would the difference have been in terms of evidence? What was so exigent that was going to – you were going to lose evidence if you didn't look right away? Because at the time when the search is going on at 1040 after 10 o'clock on a Saturday night, the agents didn't know what they had. And so they had to investigate to see what they had. Did they say anything in their report about any exigency that was causing them to do it right then? They were talking about just the phone ringing and trying to figure out who Mother Teresa was. Did they say anything in their report that they feared that the information or the evidence would be lost or destroyed? No, Your Honor. There's nothing in the reports that say that. So you have to teach them to write CYA kind of reports now? Every case is a learning lesson. Every case is a learning lesson. But to address Your Honor's question and Judge Pregerson, we did ultimately get a warrant once the – I mean, once the agent found the child pornography, they stopped and we did get a search warrant for the phone, which leads me to I think it's my sixth argument. So it wasn't hard to get, was it? No, it wasn't after during business hours when people got it. Well, you know, that's no excuse, business hours. I understand. I'm just – I'm sharing with you my experience. Don't you have people in your district attorney's office down there that handle search warrants? In the district attorney's office? Yeah. Yes. But to my knowledge, I don't know if they have jurisdiction to do a Federal offense, a search warrant for a Federal offense. And that would have been what the search warrant would have been for, for alien smuggling. They're available 24 hours, aren't they? It's my understanding that the district attorney's office has a better protocol and procedure for telephonic warrants after hours. I just don't know if they have the jurisdiction to get a search warrant for a Federal offense. But it could be a State offense. I mean, didn't California have an equivalent State offense for child pornography? But we got the warrant for child pornography. I think Judge Pregerson is asking whether we could have gotten a warrant for alien smuggling. And to my knowledge, I don't know if alien smuggling is a California offense. It's a – Well, they could have got a warrant to search the phone. We did get a warrant to search the phone. Yeah, that was after you went through it. After we found the child pornography, yes. Yeah. Okay. Yes. Okay. I mean, why would you want to get a warrant if you already had the stuff? Huh? Why would you need – why would you ask for a warrant if you already knew it was in the phone? Cell phone. You can respond, of course. Because the agents know that once the Border Patrol agents were searching for evidence related to the alien smuggling and they came across something that was not related to their crime of investigation, they did exactly what they were supposed to do and stopped. They contacted the FBI, and we got a search warrant later on. They stopped? They stopped the search. After they went through how many pictures? Approximately 170. So that's when they stopped? Yes. Okay. And then they got the warrant. So why did they have to go to 150 to decide to stop? Because there was a lot more photographs beyond 170, and there was much more information that was found pursuant to the federal search warrant that was obtained that was related to the child pornography offense. By no means was the initial search that Agent Walla, the Border Patrol agent at the station, an exhaustive search. It was not a search that Your Honor mentioned in Cotterman. It wasn't a forensic search. It was more like a search that this Court has approved in Arnold, where they were kind of going through the phone manually. Going through the phone, they get pictures of the passenger in some kind of compromised position. Correct. Is that a crime? No. Were they just going through the remainder of the photographs to see if there were more similar? I believe the report says, the record says that they were going through the phone to find evidence of the alien smuggling to corroborate either the material witness's statement or the passenger's statement that the material witness was picked up in the Calexico, California area. Thank you. Thank you. I'm just wondering, you know, if you had someone who talks about smuggling eight aliens, whatever it was, a month, why that person would be let off the hook on those serious offenses? I'm happy to. Yeah. You get encores in this Court. You get exercise here. I appreciate it. Pretty soon. How many push-ups can you do? You could probably do more than me, Your Honor. Okay. I don't know why the case was declined. It was another AUSA from our L-Central office. I don't know why, to use your words, why the passenger was let off. I don't know. Thank you. Got any rebuttal? One point, Your Honor. Just to make a factual point. The counsel mentioned about the staffing problem. What the staffing problem was, they needed to bring trainees to the area who were learning the booking process. So Border Patrol staffing needs or training needs is not a legitimate excuse to violate the Fourth Amendment. And finally, counsel mentioned that all these cases are a learning lesson. Yes, that's what prophylaxis is about. That's why this Court must teach these agents a lesson on how to proceed. Thank you. That's two points. All right. Thank you, counsel. A lively argument.
judges: Gwin, Pregerson, Fisher